**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| R.O.,<br><br>Plaintiff,<br><br>v.<br><br>SARAH HOSPITALITY, INC. *d/b/a* BROOKLYN CENTER SUPER 8,<br><br>Defendant. | Case No. ____________________<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

COMES NOW, Plaintiff R.O. and files her Complaint against Defendant Sarah Hospitality, Inc. In support, Plaintiff shows the Court as follows:

1.

R.O. is a victim of sex trafficking at the Brooklyn Center Super 8, located at 6445 James Circle N, Brooklyn Center, Minnesota 55430. From approximately 2014 through 2016, R.O. was sold for sex at the Super 8 beginning when she was a child of around 14 years old. Given the nature of the case, Plaintiff is identified in this Complaint pseudonymously. Plaintiff's counsel will disclose her full name to defense counsel as soon as they are known or as soon as an appropriate protective order is in place.[1]

[1] Plaintiff intends to move for leave to proceed pseudonymously because the allegations in the Complaint, which include child sex trafficking, are intimate and personal in nature and raise concerns for Plaintiff's own personal safety as well as that of other potential

2.

Defendant Sarah Hospitality, Inc., d/b/a Brooklyn Center Super 8 ("Defendant," "Super 8," or "SHI") is a domestic corporation organized under the laws of the State of Minnesota with its principal place of business at 11541 Palisade Ct. NE, Blaine, MN 55449-5668. Defendant SHI may be lawfully served with process upon its Chief Executive Officer, Zulfiqar Ahmad, at SHI's place of business or wherever he may be found, or as otherwise allowed by law. Defendant SHI is subject to the jurisdiction and venue of this Court.

3.

Defendant SHI owned, operated, managed, and/or controlled the Super 8 at all times relevant to this action.

4.

Defendant has been properly served with process in this action.

5.

Jurisdiction and venue are proper as to Defendant because one or more of the acts or omissions giving rise to this action occurred within this District. Further, Defendant's place of residence is within this District.

---

victim witnesses to the events giving rise to this lawsuit. Unless the Court orders otherwise, Plaintiff will obtain the position of other parties before filing a contested motion.

6.

Defendant knew or should have known that sex trafficking and prostitution were rampant at the Super 8 for years—before, during, and after Plaintiff's trafficking. Defendant knew because:

a. Defendant, by and through employees or other agents, knew or should have known about Plaintiff while she was sold for sex at the Super 8;

b. Defendant, by and through employees or other agents, knew or should have known of and permitted sex trafficking and prostitution to occur at the Super 8;

c. Defendant, by and through employees or other agents, knew or should have known about several other sex trafficking victims, including women who were perceptibly under the age of 18 based on their appearance and demeanor, at the Super 8 before, during, and after Plaintiff was trafficked at the hotel;

d. Defendant, by and through employees or other agents, knew or should have known about frequent similar and associated crimes occurring at the Super 8;

e. Defendant, by and through employees or other agents, knew or should have known about the reports by Super 8 guests

regarding sex trafficking and prostitution-related activities at the hotel; and

f. Defendant, by and through employees or other agents, knew or should have known of the signs and risks of sex trafficking in the hospitality industry, in Brooklyn Center, Minnesota, and the Twin Cities metro area, generally, and at the Super 8, specifically.

7.

A person under the age of 18 cannot consent to having sex in exchange for money. Any commercial sex involving a person under eighteen (i.e., "minor sex trafficking") is criminal sex trafficking under federal and Minnesota law, regardless of whether the child had a trafficker/pimp or was subjected to "force, fraud, or coercion." 18 U.S.C. § 1591(a); *see also* Minn. Stat. § 609.321, subd. 7a. Every person who engages in commercial sex with a child is criminally sex trafficking that child under federal and applicable state law.

8.

Illicit commercial sex, including minor sex trafficking and prostitution, was common at the Super 8. Defendant through its acts or omissions ignored, overlooked, allowed, condoned, facilitated, supported, benefited from, or permitted it at the Super 8. Defendant is liable to Plaintiff for its actions and failures to act. Defendant's liability to Plaintiff is straightforward:

a. Defendant knowingly benefited from participation in a venture that it knew or should have known engaged in an act in violation of the TVPRA and victimized Plaintiff. The Trafficking Victims Protection Reauthorization Act ("TVPRA") provides a federal cause of action to victims of sex trafficking against "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person ***knew or should have known*** has engaged in an act in violation of [the TVPRA.]" 18 U.S.C. § 1595(a) (emphasis added). While operating the hotel, a common undertaking involving risk and potential profit, Defendant (i) rented a room to Plaintiff's trafficker so Plaintiff could be violently sold for sex at the hotel, and (ii) did so despite what it knew or should have known about Plaintiff being a victim of sex trafficking at the hotel. As a result of Defendant's conduct, Plaintiff suffered physical and mental harms, and Defendant is liable to Plaintiff for the damages arising from those harms under the TVPRA.

b. The Super 8's participation includes a policy or practice of failing to take reasonable care in the operation and security of its hotel, despite what it knew or should have known about the foreseeable risks of harm to its guests, including Plaintiff,

arising from the criminal and dangerous conduct, including sex trafficking, at its hotel when it knew or reasonably should have known it was happening. This included failing to take reasonable steps to identify and report criminal activity, including sex trafficking and attendant abuse, failing to develop, implement, or enforce policies relating to the identification and prevention of crime, including sex trafficking, at the hotel, and failing to take reasonable care in the hiring, firing, training, and discipline of Defendant's employees to ensure that they, in turn, acted responsibly in identifying, reporting, and preventing criminal activity that could cause harm to Defendant's guests, including Plaintiff.

c. Because Plaintiff was a child and a victim of sex trafficking at the Super 8, Masha's Law, 18 U.S.C. § 2255, provides an additional avenue to pursue Plaintiff's civil remedy for the substantive violation of 18 U.S.C. § 1591, which includes her being sold for sex to multiple buyers while being harbored at the Super 8.

9.

Super 8 is a trade name of the subject hotel in this lawsuit. It lacks any independent existence, and its acts or omissions are only those of Defendant, its staff,

employees, or other agents. Such persons or entities are the means by which Defendant owned, operated, controlled, or managed the Super 8 as alleged herein.

10.

Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation is that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who were actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Defendant at the Super 8 or otherwise within the course and scope of such persons' relationship with Defendant and for Defendant's benefit.

## I. R.O.'s trafficking at the Brooklyn Center Super 8.

11.

Beginning in 2014, when she was only 14 years old, R.O. was illegally harbored, falsely imprisoned, and sold for child sex at the Super 8. R.O.'s traffickers took her to the Super 8 because they knew it would be a good place to sell R.O. for sex. They knew from prior dealings with the hotel and its staff, and by the hotel's reputation, that the Super 8 or at least some of its employees would turn a blind eye, or even facilitate, the sale of R.O. for sex. They believed they could engage in the sale of R.O., or others, including minors, for sex without being detected due to the lack of reasonable measures to identify, to report, and to prevent criminal activity at the Super 8, including sex trafficking.

12.

From at least 2014 through 2016, R.O. was a minor victim of sex trafficking at the Super 8. At all times during her trafficking, R.O. was under the age of 18.

13.

In 2014, an acquaintance introduced R.O. to a male pimp (trafficker), Jerome McRoy. McRoy would become R.O.'s primary trafficker. That same year, her trafficker began selling R.O. for sex in the Twin Cities area.

14.

Also in 2014, R.O.'s trafficker took her to the Super 8 where he harbored and repeatedly sold her for sex to numerous buyers.

15.

R.O. was trafficked beginning when she was 14 years old and continuing after she turned 15. Her young age, well below 18 years old, was perceptible from her appearance and demeanor to anyone who saw her.

16.

R.O.'s trafficker rented rooms at the Super 8 in his own name. He typically paid in cash. R.O. frequently accompanied her trafficker during the payment transactions. At about 45 years old, R.O.'s trafficker was obviously much older than her. While checking in, R.O.'s young age and circumstances were fully apparent to each Super 8 employee that checked her and her trafficker

into a room such that they knew, or should have known, she was not 18 years old. Among other signs, Super 8 staff could observe a complete lack of affection or natural relationship between R.O. and her trafficker, R.O. acting as if she was not free to leave on her own, R.O.'s lack of identification, and R.O.'s cowed deference to her trafficker out of fear that if she did not keep her place, she or someone else might get hurt.

17.

Hotel staff knew or should have known that R.O. was a minor being harbored and sold for sex in the room her trafficker rented at the Super 8.

18.

On more than one occasion, R.O.'s trafficker sent her to the front desk to pay for the room rented by her trafficker. R.O.'s trafficker provided the cash to pay for the room, which was earned from selling R.O. for sex. During these transactions, R.O. was not required to show ID. R.O.'s young age and demeanor were apparent to the front desk or other staff who accepted the payment for the rooms. During these and other encounters, R.O. was also often dressed in clothing inappropriate for her age and weather. These and other signs should have alerted hotel staff that R.O. was being sold for sex at the Super 8.

19.

R.O. was sold at the Super 8 for two to three days at a time, a couple of times per month, every month or so, between 2014 and early 2016. While at

the Super 8, R.O. was forced to have sex with at least 5 to 10 buyers per day—known as "dates"—and sometimes more. The buyers would arrive at the hotel, typically without luggage or registering as guests. They entered the room where R.O. was being harbored and stayed inside for short periods of time, ranging from 15 minutes to an hour or so. They would leave just as quickly as they came.

20.

Buyers of sex came in a steady stream to the room where R.O. was kept. Defendant knew or should have known that the number of daily, older male visitors to a room where an obviously minor-age girl was being harbored was an obvious sign of child sex trafficking.

21.

Hotel staff regularly serviced the room where R.O. was being harbored and observed obvious signs that R.O. was being sold for sex. Housekeeping staff entered R.O.'s room on a regular basis, typically daily. They would frequently observe R.O. who was obviously underage and significantly younger than the older male that accompanied her and booked the room. Staff could also see R.O.'s skimpy clothing, used condoms in the trash, and boxes of unused condoms and related sex paraphernalia out in the open. Often, the unmistakable odor of sex lingered inside the room. On more than one occasion, R.O. recalls housekeeping staff watching her bring a new date into the room. These

and so many more were tell-tale signs that R.O. was being sold for sex at the Super 8.

22.

Hotel staff also regularly encountered R.O. under circumstances further indicating that she was a child sex-trafficking victim. R.O. would regularly go to the front desk to request more towels and linens for her room. The number and frequency of such requests far exceeded the ordinary amount of housekeeping items needed for a routine hotel stay. This should have been a red flag for the Super 8 that R.O. was being trafficked due to the common need for sex-trafficking victims, like R.O., to clean themselves during and between the frequent sexual encounters with the regular tide of unregistered male guests visiting the rooms they stayed in.

23.

R.O. was not the only victim at the Super 8. Other traffickers at the Super 8 similarly required that their trafficking victims, including minors, engage in commercial sex acts at the Super 8 with similar frequency and under similar circumstances as R.O. (*i.e.*, they dressed inappropriately and were accompanied [and controlled by] older male pimps who trafficked them, they were harbored in rooms filled with sex paraphernalia and other signs of commercial sex work, their demeanor demonstrated they were not free to go and they were often using drugs or subject to violence or control, there was frequent

traffic of unregistered male guests up to the floor and in the rooms where children were kept, and they required excessive linens, towels, and other housekeeping supplies). While at the Super 8, R.O. observed or was otherwise aware of around six other minor victims who were also sold for sex at the Super 8 during the same time that she was trafficked there.

24.

R.O. and other victims, including children, were dressed in clothing typical of sex-trafficking victims. They wore clothing that was inappropriate for their age and the weather, especially in the winter. Their apparel was provocative and revealing. It barely covered their naked bodies underneath and sensualized their features, like high heels, substantial makeup, and clothing made of fishnet and other sheer fabrics. The girls would walk openly around the hotel dressed like this, including through the lobby and areas within view of front desk and other hotel staff.

25.

R.O. and other victims were harbored in Super 8 rooms under threat of physical, psychological, reputational, or other harm. This included threats of and actual physical harm to R.O. or others while in R.O.'s presence, actual harm inflicted by R.O.'s traffickers to other sex-trafficking victims or other persons as a "warning" to their victims, and manipulation through drugs,

resources (including housing, food, and clothing), threats to familial or other relationships, and other means of manipulation.

26.

R.O.'s trafficker kept all the money from the sale of R.O. for sex. He would use some of the money to pay for the room in cash and to buy food, clothing, makeup, and related services for R.O. and another female companion.

27.

The Super 8 hotel made substantial profit from the sale of R.O. for sex over the years. It also profited further from the sale of other women and children for sex at the hotel. Those transactions involved payments, usually in cash, for each room, each night that the women were harbored there and sold for sex.

28.

The Super 8 also knew or should have known from prior dealings with R.O.'s and other traffickers who frequented the Super 8 and nearby hotels that they were selling women and girls for sex, including minors, at the Super 8.

29.

The widespread commercial sex activity at the Super 8 attracted significant buyer traffic. R.O. estimates that the Super 8 accommodated dozens of buyers *each day*. Defendant knew or should have known that the daily traffic

of unregistered male visitors to rooms harboring women and funded by cash payments was another clear indicator of sex trafficking at the Super 8.

30.

Defendant maintained a policy or practice of allowing and facilitating trafficking at the Super 8, including the trafficking of R.O. and other children. This was implemented by, among other things, agreeing to house R.O.'s trafficker as well as other traffickers, their associates, and victims; knowingly placing R.O. and other trafficking victims in secluded and out-of-the-way areas of the hotel; concealing sex trafficking and protecting conduct Defendant knew or should have known constituted criminal sex trafficking; failing to call law enforcement, other authorities, or otherwise to report and to prevent sex trafficking; and supplying traffickers with items, supplies, and a location where they could sell R.O. and other victims, including children, for sex at the Super 8. Defendant followed this policy in relation to R.O.'s trafficking and the trafficking of other victims because the hotel failed to report or encourage its staff and guests to report such activities at the property.

31.

The Super 8 established ongoing and recurring business relationships with R.O.'s trafficker and his associates over the course of her years-long trafficking at the Super 8. R.O.'s traffickers were familiar with and familiar to Super 8 staff from, among other things, previous room rentals where the trafficker conducted similar sex

trafficking or other illicit activity at the Super 8. Because it was profitable to maintain this ongoing business relationship, Super 8 staff invested in and furthered their business relationship with R.O.'s trafficker by renting rooms and providing other services that furthered the illicit and dangerous activity at the Super 8, including R.O.'s and other children's sex trafficking, over the entire period in which R.O. was sold for sex at the Super 8.

32.

Defendant increased its profit from R.O. and others' sex trafficking at the Super 8. The Super 8 monitored the activity at the hotel and, whenever the activity at the hotel increased, which the Super 8 knew, or should have known, was a result of R.O. and other victims', including children's, sex trafficking, the Super 8 increased the price it charged for room rentals to the traffickers so that the Super 8 could make more money.

33.

The Super 8 also maintained a policy and practice that facilitated and nurtured a relationship with R.O.'s trafficker, as well as others engaged in similar or related illicit and dangerous activity at the Super 8. The Super 8 was aware, or should have been aware, that moving locations was necessary and common among sex traffickers and those who conducted illicit activity at hotels like the Super 8, including R.O.'s trafficker. This was routinely done to evade detection by law enforcement (or others who might interfere with the illicit activity and the Super 8's participation in it). The Super 8 benefited when persons it knew or should have known were engaged in

recurring sex-trafficking operations at the Super 8 changed locations. Changing locations reduced unwanted interference by law enforcement or others in the Super 8's operation and rampant illegal and dangerous activity that pervaded there and from which the Super 8 profited. The Super 8 maintained a policy or practice that kept its premises available and open as a haven for R.O.'s traffickers to use the Super 8's rooms, facilities, personnel, and services to continue selling R.O. for sex there whenever the trafficker wanted to do so and each time the trafficker returned with R.O. to conduct the recurring, illegal sale of R.O. for sex. The Super 8 maintained a similar policy and practice for other illicit activity, including drug and commercial sex work. These policies and practices facilitated and nurtured the Super 8's ongoing and recurring relationship with sex traffickers and others engaged in illicit and dangerous conduct, including R.O.'s trafficker and associates, even though the Super 8 knew or should have known of the obvious illegal conduct recurringly occurring there and obvious efforts to conceal that conduct by regularly changing locations.

34.

Around January 2016, R.O.'s trafficker and an associate, Camishia Robinson (who also engaged in commercial sex and accompanied R.O. and her trafficker at the Super 8), took R.O. to Georgia for the purpose of selling R.O. for sex there. All three (R.O., McRoy, and Robinson) were detained by law enforcement following a traffic stop. This exposed the criminal venture of trafficking R.O. in Minnesota and beyond. Both Robinson and McRoy were criminally charged under Georgia and federal law for their role in the sale of R.O. for sex.

*See United States v. McRoy*, et al., No. 1:16-cr-00437-CAP-JFK (N.D. Ga. 2016); *State of Georgia v. McRoy* et al., No. 16-sc-144725 (Fulton Cty. 2016). Both McRoy and Robinson were convicted. In 2018, they pleaded guilty in federal court to one count of transporting a minor with intent to engage in criminal sexual activity. In 2019, they pleaded guilty to five counts, including criminal sex trafficking, pimping of minor, pandering of a minor, interference with custody, and contributing to the delinquency of a minor. Both were sentenced to multiple decades, to serve at least 10 or more years, for trafficking R.O.

## II. Defendant's knowledge of crime at the Super 8.

35.

The Super 8 had a well-established reputation for criminal activity, including prostitution and sex trafficking, as well as drug and other crime that is well known to accompany prostitution.

36.

Before, during, and after Plaintiff's child sex trafficking at the Super 8, prostitution, sex trafficking, and child sex trafficking were rampant, frequent occurrences at the hotel that were or should have been known to the Super 8.

37.

Defendant owned, managed, operated, and/or controlled the Super 8 and employed the employees there, giving it specific and direct knowledge of prior and ongoing crime, including prostitution and sex trafficking occurring at the

hotel during and before its period of ownership and operation of the hotel, but not later than 2013.

38.

Defendant was aware of the risks of its hotel becoming a hub of sex and other crimes that typically accompany places of prostitution, like the Super 8, and the harms that could be inflicted on victims of such crimes, like Plaintiff. Defendant was or should have been aware that the Super 8 in fact did become a hub for such illicit activity.

39.

Defendant also had actual or constructive knowledge of the Super 8's publicly available online reviews, which it monitored or should have been monitoring, which reported signs of commercial sex, including prostitution and sex trafficking, as well as attendant criminal and dangerous activity at the hotel from several years before, during, and for years after R.O. was sex-trafficked there, including the following (reproduced below):

a. June 2012 | Expedia

the majority of clientele was **hookers, pimps and drug dealers**. I will never be back. Anybody that brings kids to this dump, should be prosecuted.

b. July 2012 | Expedia

**Drugs, Prostitution need I say more.** This Location should not be associated with Hotels.com. I never review, this was truly a bad experience.

c. August 2013 | TripAdvisor

This place was terrible, we were supposed to stay there for 2 nights for a softball tournament turned into a nightmare and we left after the first night. When we arrived and went to out room the place stunk and the floors were filthy, lots of people walking around parking lot at night. **Walking thru hallway we saw a used condom laying in hall and told front desk man who replied 'yes I know but I don't have anyone here to pick it up'.** Still have not got refund for the 2 nights because we left after one, Beware.

d. January 2014 | TripAdvisor

Yelling and arguing in the hallways all night long. Night clerk would just walk by pretending he couldn't hear them. Small kids walking unleashed pit bulls at 3:30am. **Open drug use. Lots of condoms in parking lot. Just a nightmare.** While I stay at super 8 hotels frequently I will avoid this one forever.

e. May 2014 | TripAdvisor

One of the worst Motels I've ever stayed in. Not many places I stay where I feel the need to sleep with my pistol under the pillow but this was one. Carpet was filthy and AC unit had not worked in years. **Hookers and drug dealers roamed the halls.**

f. June 2014 | TripAdvisor

dope dealers trying to sell me their product in hallways and **got a gentle knock on door from hotel hooker asking if I needed company**.

g. June 2015 | TripAdvisor

To many people coming and going through out the night. **lots of prostitution** and loud people through out the night.

h. July 2015 | TripAdvisor

I did not feel safe staying at this hotel. This was the first time I've been required to sign a waiver checking in, to the effect that 'Illegal activities are not tolerated, and you will be evicted'. **I was harassed by prostitutes**, **following me and begging for money**. There were people slamming doors and arguing in the hallway all night. Shady characters hanging around the parking lot all night. Police are called frequently. I will not stay here again!

i. November 2017 | TripAdvisor

It's the worst place I've ever been at I'm afraid of the other guests **I've seen prostitutes and drug dealers openly walking around selling drugs and their hookers. . . . I believe the staff buys prostitutes and drugs from the guests**.

j. August 2018 | TripAdvisor

This place is absolutely horrible. **Drug addicts, prostitution, pimps, people selling stolen merchandise in the parking lot.** Do yourself a favor and stay away. **The staff will lie to your face and say nothing is wrong with their hotel.**

October 2018 | Yelp

I would be very leary of staying here. especially if coming with a family. It seemed more like a homeless shelter with people hanging out in the parking lot, the front desk, and hallways. There was also a strong smell of weed in the hallway. When I interacted with the front desk staff, they always appeared like they didn't want to talk. I felt scared leaving in the evening to eat dinner with several

people hanging out in their cars in the lot. Yes, they did redo the rooms, but my safety is more important.

k. 2018 | Google

This is the worst motel I've ever stayed in from the **drug addicts** to the **prostitutes** to the rude staff members tweeker maintenance men working at 4:00am sawing banging around the motel ppl slamming doors all night beds are old sheets stained mold all over the place nasty bathrooms air conditioner leaked in the wall I know there's mold in the wall. I'm actually calling the health department in the morning I think there may be bed bugs and roaches in here as well. I wish I had a better place to stay I definitely wouldn't be here right now.

l. 2019 | Google

Filthy from top to bottom. Room had water leak so I'm sure mold was growing everywhere. Woke up sick because all the moisture in the room. First night we stayed, **a local guide informed us that this hotel was where all the prostitutes stayed and was a high drug traffic area** which I believe because our first night **a random stranger who looked high out of his mind asked me if I wanted cocaine and/or needed a girl for the night**.

(Notably, "Super 8 – Brooklyn Center Management" signed a response to this review, specifically thanking the reviewer for "**bringing it to our notice about people trying to sell drugs and prostitution**.")

40.

Defendant knew or should have known of these and other customer reports about the commercial sex- and drug-related crime and illicit activity occurring at Super 8 before, during, and after R.O. was sold there for sex.

41.

In addition to all of the above, the police frequently investigated and made arrests for substantially similar instances of sex crimes at the Super 8

as well as criminal activity that is commonly known to accompany such crimes. Much of this activity either alerted or should have alerted Defendant to the hotel's sex trafficking, prostitution, and sex crime problem. As inexhaustive examples, the following incidents at the hotel and nearby properties did or should have further alerted the Super 8 to the risk and actual occurrence of trafficking, prostitution, and related dangerous and criminal activity before the period in which Plaintiff was trafficked there.

a. In February 2014, a man was charged for sex trafficking two young trafficking victims against their will at the Super 8 Brooklyn Center.[2]

b. In 2012, two men were arrested for trafficking minor victims at a Super 8 in the metro area and were convicted of sex trafficking. [3]

42.

Just recently, on September 9, 2026, the Super 8 was the subject of large-scale raids by law enforcement, which resulted in the rescue of 17 women and girls, including minors, from human trafficking there and at other hotels in the Twin Cities metro.[4]

---

[2] https://www.twincities.com/2014/02/06/minneapolis-pimp-held-2-women-captive-at-hotel-charges-say/

[3] https://www.southernminn.com/northfield_news/news/northfield-man-one-of-two-sentenced-for-sex-trafficking/article_3a352773-79f1-5789-9483-851bbbfb4a50.html

[4] https://www.fox9.com/news/brooklyn-center-hotel-raids-17-women-minors-rescued-from-trafficking-police-say; https://www.cbsnews.com/minnesota/news/brooklyn-center-hotel-raid-sept-9-2026/.

43.

Another victim, T.S., has sued Defendant alleging that as a fifteen-year-old she was repeatedly sold for sex at the Super 8 from August through December 2013.[5] Like Plaintiff, T.S. also alleged there were ample signs that she and other victims were being illegally sold for sex in rooms rented by the Super 8 to traffickers, from which Defendant illegally benefited. This includes allegations that Super 8 staff and management were aware that commercial sex, including potential prostitution, was happening in the room where T.S. was being harbored, yet did nothing about it.[6] T.S. also alleged the existence of numerous policies and practices by Defendant that constituted its participation in ventures that it knew or should have known violated the TVPRA, like developing ongoing business relationships with traffickers; allowing Super 8 staff to go untrained or otherwise not follow reasonable procedures relating to guest safety, criminal activity, and sex trafficking; implementing a policy of not involving law enforcement when trafficking was or should have been suspected; providing internet services to traffickers despite those services being used to exploit victims, including minors; and creating an environment that encouraged trafficking activity because the Super 8 allowed it to happen without

---

[5] *T.S. v. Wyndham Hotels & Resorts, Inc. f/k/a Wyndham Worldwide Corporation, d/b/a Super 8 Hotel, et al*., No. 23-cv-02530-PJS-ECW (D. Minn.), ECF 28.

[6] *Id.*, ¶ 81.

detection or interference by Super 8 personnel and law enforcement.[7] All of these policies and conditions pre-existed Plaintiff's trafficking at the Super 8 and persisted and were implemented through the entire period in which Plaintiff was sold for sex at the Super 8.

44.

Defendant and the Super 8 staff knew or should have known that obvious sex trafficking, including R.O.'s sex trafficking, was occurring at their property, at times with the assistance of or facilitation by its staff.

45.

Despite the dangerous, illegal, and criminal activity surrounding the property, the Super 8 negligently failed to implement appropriate security measures, policies, procedures, or training to identify, deter, or reduce such activity.

46.

Despite having actual or constructive knowledge of illicit and dangerous activity, including child sex trafficking, Defendant failed to take reasonable steps to stop such illegal and dangerous activities from occurring, including that involving its own employees.

---

[7] *Id.*, ¶ 97.

47.

Additionally, Defendant failed to train Super 8 staff in a reasonable and uniform manner, including, among other things, training them on the warning signs that prostitution or sex trafficking may be occurring at the hotel.

48.

Defendant also failed to train its staff in a reasonable and uniform manner, including, among other things, how staff were supposed to interact with the police and attempt to determine the nature and cause of crime occurring at the property, so the hotel could better deter or prevent crime in the future.

49.

Defendant also failed to properly supervise Super 8 staff to ensure the hotel was not facilitating sex trafficking and participating in sex trafficking through the business of the hotel, as was the case with R.O.'s trafficking.

50.

Defendant also failed to develop a reasonable security plan to deter and to prevent dangerous, violent, and illegal activity from continuing to occur at the property, including specifically prostitution, pimping, sex crimes, violence against women, and sex trafficking.

51.

Defendant knew or should have known that it was permitting the hotel to be used as a place of prostitution and sex trafficking and engaged in

measures to actively participate in ventures with Plaintiff's trafficker despite knowing or having reason to know that the trafficker was illegally selling R.O. for sex at the Super 8.

## III. Defendant's knowledge of sex trafficking generally.

52.

Defendant knew or should have known of the existence of sex trafficking and its illegality more than 20 years ago, since the passage of the Victims of Trafficking and Violence Protection Act of 2000 and the United Nations' adoption of the Palermo Protocol to prevent, suppress, and punish trafficking in persons.

53.

Defendant knew or should have known that during the relevant period sex trafficking was prevalent in the Twin Cities and Minneapolis–St. Paul metropolitan area generally. Defendant knew or should have known that these areas in proximity to its hotel were hubs of sex trafficking and that the crime was prevalent in the city, including at the Super 8. Defendant benefited from some of those illicit profits by rental rates paid for the hotel rooms used for the trafficking of Plaintiff.

54.

The Office of the Minnesota Attorney General has recognized that Minneapolis is one of the top locations in the United States for child sex trafficking,

and a six-month study by local prosecutors identified more than 34,000 online advertisements for commercial sex in the Twin Cities.[8]

55.

Defendant knew or should have known that the commercial sexual exploitation of minor girls in the Twin Cities had been specifically studied and documented. In 2014—the same year that R.O.'s trafficker started selling her for sex at the Super 8—researchers at the University of Minnesota's Urban Research and Outreach-Engagement Center, in a study funded by the Women's Foundation of Minnesota titled "Mapping the Market for Sex with Trafficked Minor Girls in Minneapolis," charted a substantial and active market for the purchase of sex with trafficked minor girls in Minneapolis.[9]

56.

Defendant knew or should have known that law enforcement had specifically identified the Twin Cities as a significant hub of child sex trafficking. The Federal Bureau of Investigation identified the Twin Cities as one of thirteen United States cities with a particularly high incidence of child

---

[8] Sex Trafficking, Office of the Minnesota Attorney General, https://www.ag.state.mn.us/Consumer/Publications/SexTrafficking.asp.

[9] Lauren Martin et al., Mapping the Market for Sex with Trafficked Minor Girls in Minneapolis, University of Minnesota Urban Research and Outreach-Engagement Center (2014).

prostitution, and in 2015 Minnesota reported the third-highest number of human trafficking cases in the nation.[10]

57.

Defendant knew or should have known that motels and hotels are "a particularly attractive site for criminal activity ranging from drug dealing and prostitution to human trafficking. Offering privacy and anonymity on the cheap, they have been employed as . . . rendezvous sites where child sex workers meet their clients on threat of violence from their procurers." *City of Los Angeles v. Patel*, 576 U.S. 409, 428–29 (2015) (Scalia, J., joined by Roberts, C.J., and Thomas, J., dissenting). "According to Minneapolis police, all but one of the child sex trafficking cases charged in Minneapolis in 2012 involved the use of hotels . . . ."[11] "Hotels, motels, and short-term rentals are key players in addressing sex trafficking in all Minnesota communities."[12]

58.

Defendant knew or should have known the following: The National Human Trafficking Hotline has reported that over 91 percent of the calls it received and obtained information on involving motels and hotels were sex

---

[10] Human Trafficking Awareness, Minnesota Department of Transportation, https://www.dot.state.mn.us/humantraffickingawareness/.

[11] https://www.mprnews.org/story/2013/01/08/police-enlist-hotels-in-fight-against-sex-trafficking

[12] https://www.health.state.mn.us/communities/safeharbor/communities/hoteltrafficking.html

trafficking cases, and another 2.6 percent reported a combination of sex and labor trafficking.[13] A 2012 study found that 63 percent of trafficking incidents occurred in motels.[14] And the Polaris Project found that "75 percent of [trafficking] survivors . . . reported coming into contact with motels at some point" during their exploitation.[15] Unfortunately, "94 percent" also "disclosed they never received any assistance, concern, or identification from motel staff."[16]

59.

Defendant knew or should have known that attorneys for the motel industry estimated and reported to motel industry representatives that eight out of ten human trafficking arrests occur in and around motels,[17] and that the industry had been warned, among other things, to "Make sure motel not

[13] National Human Trafficking Hotline, *National Hotline Cases Occurring in Hotels and Motels: United States 1/1/2012–12/31/2016*, at 3, https://respect.international/wp-content/uploads/2020/11/National-Hotline-Cases-Occurring-in-Hotels-and-Motels-.pdf (last visited Feb. 20, 2026).

[14] Jon Conte et al., *Business Ending Slavery and Trafficking, Inhospitable to Human Trafficking Program Evaluation* 5 (July 2014), https://web.archive.org/web/20210511135432/https.www.bestalliance.org/uploads/5/0/0/4/50047795/itt_program_evaluation.11_without_appendix.pdf.

[15] Polaris Project, *On-Ramps, Intersections, and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking* 16 (2018), https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking-Hotels-and-Motels.pdf (last visited Feb. 20, 2026).

[16] *Id.* at 23.

[17] Rich Keating, *Human Trafficking: What Is It and How It Impacts the Hospitality Industry* 6 (presentation at AHIA Sprint Conference 2013), https://perma.cc/X5DG-YQ3M.

complicit," "Manager not looking the other way," and "No pay off for silence or lack of curiosity."[18]

60.

Defendant knew or should have known that the organization called End Child Prostitution and Trafficking (ECPAT-USA) launched The Code of Conduct for the Protection of Children from Sexual Exploitation in Travel and Tourism (the "Code") in the United States in 2004.[19]

61.

Defendant knew or should have known that the Code, which lays out well-established best practices for the hospitality industry to identify, to address, and to deter sex trafficking, identifies six reasonable and logical steps hotels and motels can take:

a. establish corporate policy and procedures against sexual exploitation of children;

b. train employees in children's rights, the prevention of sexual exploitation and how to report suspected cases;

c. include a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children;

d. provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases;

---

[18] *Id.* at 19.

[19] *See The Code*, ECPAT-USA, www.ecpatusa.org/code/ (last visited Feb. 20, 2026).

e. support, collaborate, and engage stakeholders in the prevention of sexual exploitation of children; and

f. report annually on the company's implementation of Code-related activities.

62.

Defendant knew or should have known that ECPAT is only one of several high-profile organizations that have for years given hotels and motels the tools to address the scourge of sex trafficking.

63.

Defendant knew or should have known that during the relevant period the Department of Homeland Security ("DHS") published guidelines to help hotels and motels detect and respond to human trafficking. DHS's guidelines instruct housekeeping, maintenance, front desk, and security, among other hotel personnel, to be vigilant in looking for signs of human trafficking at hotels and motels; such signs include:

a. persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, or unusual behavior;

b. persons who lack freedom of movement or are constantly monitored;

c. persons who have no control over or possession of money or ID;

d. persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;

e. requests for room or housekeeping services (additional towels, new linens, etc.), but denial of motel staff entry into the room;

f. the presence of multiple computers, cell phones, pagers, credit card swipers, or other technology in the room;

g. extended stay with few or no personal possessions in the room;

h. excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.);

i. the same person reserves multiple rooms;

j. a room is rented hourly, less than a day, or for an atypical extended stay;

k. attempts to sell items to or beg from patrons or staff;

l. cars in the parking lot regularly parked backward, so the license plates are not visible;

m. loitering and solicitation of male patrons;

n. waiting at a table or bar and picked up by a male (trafficker or customer);

o. persons asking staff or patrons for food or money; and

p. persons taking cash or receipts left on tables.

64.

Without a market—a conveniently located and anonymous place to confine humans, exchange money, and peddle sex—sex trafficking would cease to exist. In Plaintiff's case, the Super 8, for a fee, provided this market for Plaintiff to be confined and sold.

## COUNT I
## STATUTORY LIABILITY: SEX TRAFFICKING
## 18 U.S.C. § 1595

65.

Plaintiff incorporates the foregoing and following allegations as if fully restated herein.

66.

In violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595(a), Defendant knowingly benefited from participation in a venture that Defendant knew or should have known engaged in acts in violation of the TVPRA.

67.

Defendant knowingly benefited from Plaintiff's sex trafficking by receiving revenue generated by the operation of the Super 8, including the revenue generated for each night in each room in which Plaintiff was harbored as a minor sex-trafficking victim. Each day over the multiple years that Plaintiff was sold for sex at the Super 8, Defendant knowingly benefited by receiving money from Plaintiff's trafficking in the form of room-rental fees and revenue from ancillary products and services.

68.

Defendant's operation of the Super 8 constituted a venture.

69.

Defendant participated in its hotel venture and knew or should have known that its operation of the hotel violated the TVPRA by harboring and falsely imprisoning Plaintiff so that Plaintiff could be sold for sex as a minor at the Super 8.

70.

Defendant also participated in a venture involving Plaintiff's sex trafficker and other traffickers with their own victims. The rental of rooms and provision of other services for profit to Plaintiff's trafficker, rooms in which Plaintiff and others were sold for sex to generate revenue for Defendant, also constituted a separate venture under the TVPRA.

71.

Defendant profited from every stay by every patron at the Super 8, both from room rentals and from other hotel services. At all times, Super 8 monitored its premises and was or should have been aware of criminal activity thereon, including sex trafficking. At all times, Super 8 had the authority and means to discontinue room rentals and to remove unwanted patrons from its premises on its own through lawful means or by enlisting the support of law enforcement.

72.

Defendant is responsible for the acts, omissions, and knowledge of all of its employees or others acting as its agents or otherwise in its interests, at its direction, and for its benefit at the Super 8. Said acts and omissions were committed within, and said knowledge obtained within, the scope and course of their employment, which Defendant ratified, and which resulted from Defendant's failure to exercise reasonable care in the hiring, training, and supervision of those employees given the known risk of human trafficking at the hotel. Defendant knew or ignored the fact that victims were being sex-trafficked at the Super 8 and, despite this, continued to knowingly benefit from its association with traffickers by providing them a venue, in the form of hotel rooms and related services, in which to harbor their victims and to facilitate their exploitation.

73.

Defendant facilitated the sex trafficking that operated out of the Super 8, including by: (a) developing and building continuing relationships with traffickers operating at the hotel before Plaintiff's first time being trafficked and in each subsequent time Plaintiff was trafficked there; (b) adopting inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to guest safety, criminal activity, and trafficking; (c) choosing not to contact or develop policies for

not contacting law enforcement despite the obvious presence of ongoing sex trafficking of minors and other victims; (d) continuing to provide Wi-Fi and other services to traffickers even though it knew or should have known those services were being used to advertise victims for commercial sexual exploitation; (e) creating an environment in which traffickers could operate without concern for detection or interference by hotel staff; and (f) implementing policies that facilitated sex trafficking and related crime, aided in the concealment of trafficking and related crime from authorities, and increased and maximized the hotel's profit from sex trafficking.

74.

Defendant did not merely provide traffickers with a physical space; it also provided the cover of a legitimate business as a venue where traffickers could profit from commercial sexual exploitation with a low risk of disruption. This was done pursuant to an implicit understanding between Defendant and traffickers, evidenced by, among other things: these traffickers were familiar to the staff at the Super 8; traffickers took no or few steps to conceal the trafficking activities and instead freely made requests that would facilitate their trafficking without concern for detection or interference by staff; Defendant acquiesced to the requests by traffickers that promoted the concealment of their trafficking activity, including with respect to room placement and engagement with housekeeping staff; Defendant allowed traffickers to take steps

that minimized their traceability to law enforcement, such as accepting cash or other nontraceable forms of payments and not requiring proper identification; and Defendant provided additional services to traffickers, including internet access, excessive towels and linens, and extra housekeeping services to clean up after the trafficking venture once the traffickers vacated the rooms.

75.

The ventures in which Defendant participated were in or affecting interstate commerce. Defendant's conduct and the venture in which Defendant participated utilized the channels and instrumentalities of, or otherwise affected, interstate or foreign commerce, among others including highways and interstates, vehicles traveling and sold in, goods and services, advertisement, and the internet. Defendant opened its hotel to and operated it as a house of lodging to serve (and which did in fact serve) individuals who traveled to the hotel from other states and/or foreign countries. Defendant also used the instrumentalities of commerce (*e.g.*, the internet, mail, franchise operations and relationships, banking, credit card processing, supplies and equipment for use and/or resale at the Super 8, like condoms and other personal care products, and other goods and services procured from or otherwise located outside the state of Minnesota) to further and to conduct its business of operating the Super 8. The nature of Defendant's operation of a hotel and provision of products and services provided in attendance therewith, generally, as well as all those

individuals involved in the ventures in which Defendant participated (including Plaintiff's illegal sex trafficking), specifically, had a substantial effect on or were otherwise conducted by means of interstate commerce.

76.

Defendant's harboring Plaintiff as part of her sex trafficking constituted false imprisonment because she was limited in her freedom of movement in her room and/or on the premises at the Super 8. At times, Plaintiff's false imprisonment at the Super 8 was independent of any other aspect of her trafficking, such as sexual encounters, assaults, or batteries she may have endured.

77.

Defendant knew or should have known the venture engaged in acts in violation of the TVPRA because Defendant's agents, employees, and representatives participated in the rental of rooms to Plaintiff's traffickers, and also participated in Plaintiff's harboring and child sex trafficking, at the Super 8. Defendant knew or should have known that it so participated.

78.

Defendant also knew or should have known the venture(s) engaged in one or more acts in violation of the TVPRA, including, *inter alia*, 18 U.S.C. § 1591, because Defendant's agents, employees, and representatives knew or should have known of other sex trafficking and illegal criminal activity occurring at the Super 8.

79.

Defendant is directly and vicariously liable under 18 U.S.C. § 1595(a) for the actions of its agents and representatives.

80.

Plaintiff has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of Defendant's participation in this venture, including her false imprisonment at the Super 8.

81.

Defendant is liable to Plaintiff for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages under 18 U.S.C. § 1595(a).

82.

Defendant is jointly and severally liable to Plaintiff for damages arising from the indivisible injuries caused to Plaintiff, whose damages were directly and proximately caused by the acts alleged herein.

**COUNT II**
**STATUTORY LIABILITY: MASHA'S LAW, 18 U.S.C. § 2255**

83.

Plaintiff incorporates the foregoing and following allegations as if fully set forth herein.

84.

Plaintiff was under the age of 18 when she was trafficked at the Super

8.

85.

Plaintiff was a victim of violations of 18 U.S.C. § 1591 at the Super 8.

86.

As described herein and specifically in paragraphs 65–82, Defendant knowingly benefited from participating in a venture that it knew or should have known engaged in an act of sex trafficking at the Super 8, including the harboring and other trafficking activities which harmed Plaintiff.

87.

Plaintiff suffered personal injury as a result of Defendant's violations of 18 U.S.C. § 1591 and 18 U.S.C. § 2255. As a victim of § 1591, Plaintiff suffered concrete and particularized injury that is fairly traceable to one or more acts or omissions of Defendant and redressable through an award of damages pursuant to § 2255 by this Court.

88.

Thus, as described herein, Defendant is jointly and severally liable to Plaintiff for compensatory and punitive damages, in an amount to be determined at trial.

## DAMAGES

89.

Plaintiff incorporates the paragraphs above as if fully restated herein.

90.

As a proximate and foreseeable result of Defendant's violations of the federal and Minnesota law, Plaintiff sustained personal injuries, mental and emotional pain and suffering, experienced mental anguish, and suffered other damages as will be proven at trial. Plaintiff brings each and every claim permissible under federal law and insofar as it may be relevant, Minnesota law, against Defendant for injuries suffered in the incident at issue, and to recover for all special damages, economic losses, medical expenses, necessary expenses, pain and suffering, and all compensatory, special, actual, general, and punitive damages permissible under law, including, but not limited to:

a. Personal injuries;
b. Past, present, and future conscious pain and suffering;
c. Loss of enjoyment of life;
d. Mental anguish and emotional distress;
e. Incidental expenses;
f. All special, compensatory, economic, punitive, and other damages permissible under Minnesota and federal law; and
g. Consequential damages to be proven at trial.

91.

Plaintiff is entitled to an award of punitive damages because the actions or omissions of Defendant in the operation, management, supervision, and

control over the Super 8 exhibited willful and wanton conduct and demonstrate an entire want of care and deliberate disregard for the rights and safety of others, including Plaintiff and other victims of sexual exploitation.

92.

Defendant's actions evidence a species of bad faith, were and are stubbornly litigious, and have caused Plaintiff undue expense.

* * *

WHEREFORE, Plaintiff prays for a judgment to be awarded to her and against Defendant for the following:

a. Process issue as provided by law;
b. Plaintiff be awarded actual damages in amounts to be shown at trial from Defendant;
c. Plaintiff be awarded all general, special, compensatory, economic, consequential, punitive, and other allowable damages as determined by the enlightened conscience of an impartial jury;
d. Plaintiff be awarded all costs and expenses associated with this action, including attorney's fees as allowed by law;
e. Plaintiff be awarded a trial by jury; and
f. Plaintiff have such other relief as this Court deems just and appropriate under the circumstances.

**TRIAL BY JURY IS HEREBY DEMANDED.**

Respectfully submitted on November 2, 2026.

**ANDERSEN, TATE & CARR, P.C.**

/s/ Stephen Morrison
STEPHEN D. MORRISON, III
Minnesota Bar No. 0401401
smorrison@atclawfirm.com
PATRICK J. MCDONOUGH
(*Pro hac vice* forthcoming)
pmcdonough@atclawfirm.com
JONATHAN S. TONGE
(*Pro hac vice* forthcoming)
jtonge@atclawfirm.com
*Attorneys for Plaintiff*

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone
(770) 822-9680 | Facsimile